IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CR107 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| ALBERTO MAGALLANES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the government's objection, Filing No. 36, to the findings and recommendation ("F&R") of the magistrate judge, Filing No. 35, concerning the defendant's motion to suppress evidence obtained as a result of a traffic stop and subsequent search that occurred on November 30, 2009. Filing No. 25. The indictment charges defendant with two counts under 21 U.S.C. § 841(a)(1), (b)(1) for intentionally possessing with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of a Schedule II controlled substance: (1) methamphetamine, its salts, isomers, or salts of its isomers; and (2) cocaine. Filing No. 1.

Under 28 U.S.C. § 636(b)(1), the court makes a de novo determination of those portions of the F&R to which the parties object. *United States v. Lothridge*, 324 F.3d 599, 600-01 (8th Cir. 2003). The court has conducted a de novo review of the record and exhibits, including the transcript of the suppression hearing. Filing No. 34, Transcript ("Tr."); Filing No. 31, List of Hearing Exhibits ("Ex.") 1, 101, 102. The court agrees with the magistrate judge's recitation of the facts, and concurs with the magistrate judge's recitation of the law. The court finds the government's objections to the F&R should be overruled

and the defendant's motion to suppress granted as to evidence obtained as a result of the traffic stop.

### FACTS

At approximately 10:30 p.m. on November 30, 2009, while patrolling Interstate 80 around Harrison Street, Deputy Peterson, a deputy with the Douglas County Sheriff's Office K-9 interdiction unit, "observed [a vehicle] heading eastbound with Arizona plates" driving at the speed limit.  Tr. 5:18-21, 6:17-24, 7:7-13, 26:10-12.  Deputy Peterson decided to follow the defendant's vehicle because the vehicle had out-of-state license plates.  Tr. 26:3-6.  Deputy Peterson testified that "[o]ut-of-state plates is what we typically will stop."  Tr. 25:24.  As he followed the vehicle, Deputy Peterson saw the vehicle commit two alleged traffic violations.  These alleged traffic violations consisted of  "[d]riving on the shoulder at two separate locations."  Tr. 7:12-15.  As Deputy Peterson described it, he witnessed the vehicle drive onto the shoulder of the interstate for approximately 100 feet at two separate locations.   Tr. 7:15, 28:10-13, 44:1.   Those two locations were (1) somewhere between I Street and L Street, and (2) at the Interstate 680/80 junction.  Tr. 7:17-20, 27:19-20.   Each time, the defendant's vehicle was on the shoulder for approximately one second and the width of the right side passenger tires crossed onto the shoulder.  Tr. 28:19-21, 38:10-12, 44:2-4.  Deputy Peterson testified that he had the ability to record these alleged traffic violations on video using a camera in his cruiser, but did not do so.  Tr. 27:2-17, 30:15-20.

Deputy Peterson followed the defendant's vehicle for about a mile and a half before he activated his lights and pulled over the defendant's vehicle.  Tr. 11:8-10, 30:21-22. Between the time Deputy Peterson saw the defendant's vehicle cross onto the shoulder

at the Interstate 680/80 junction and the time Deputy Peterson actually activated his light, the defendant "followed every traffic law requirement." Tr. 31:19-25, 32:3-6. Deputy Peterson gave two responses as to why he stopped the defendant's vehicle. On direct examination, Deputy Peterson testified that the only reason he stopped the defendant was because the defendant violated a traffic law by driving on the shoulder. Tr. 17:2-5.[1] On cross-examination, by the defendant's attorney, Deputy Peterson testified that he stopped the defendant for both the traffic violation and for the possibility that the defendant was an impaired driver. Tr. 38:13-18.[2]

There were two individuals in the defendant's vehicle: the defendant and his passenger. Deputy Peterson advised the defendant that he pulled the defendant over because the defendant "drove on the shoulder a couple times." Ex. 1, video at 22:35:27; Tr. 12:15. Deputy Peterson also asked the defendant if the defendant was "ok to drive."[3] Ex. 1, video at 22:35:34, 22:35:53. The defendant responded by saying he was confused due to the Interstate 680/80 junction. Ex. 1, video at 22:35:49; Tr. 11:21-23. Deputy Peterson told the defendant that confusion at this location "happens quite a bit." Ex. 1, video at 22:35:50; Tr. 16:16-19.

---

[1]The prosecution asked Deputy Peterson on direct, "did you have reasons for stopping him other than just the traffic violation?" Tr. 17:3-4. Deputy Peterson responded, "That was the only reason, just for the traffic violation." Tr. 17:5. Deputy Peterson also testified that he believed any time a vehicle crosses the shoulder line constitutes a traffic violation under Nebraska law. Tr. 44:18-20.

[2]The defendant's attorney asked Deputy Peterson on cross, "Was your stop because the vehicle violated the law, or did you think that it had been – that you were dealing with an impaired driver, or what did you think?" Tr. 38:13-16. Deputy Peterson responded, "For both reasons. For the traffic violation and possibly an impaired driver." Tr. 38:13-18.

[3]Deputy Peterson also asked if the car was a rental car. Ex. 1, video at 22:36:03. The defendant said it was. Ex. 1, video at 22:36:04.

3

Deputy Peterson then took the defendant back to his police cruiser to discuss with him the defendant's travel itinerary, destination, and purpose.  Tr. 12:25, 13:1-3.  After asking the defendant these types of questions, Deputy Peterson told the defendant that he was going to talk to the defendant's passenger.  Ex. 1, video at 22:40:42.  Before leaving the car, Deputy Peterson said to the defendant, "don't pet my dog."  Ex. 1, video at 22:40:45.  Deputy Peterson then asked the passenger similar questions to the ones he asked the defendant.  Ex. 1, video at 22:41:27-22:43:06.  The passenger had trouble speaking the English language.  Ex. 1, video at 22:41:19.  Both the defendant and the passenger said they were traveling together, but gave some apparently inconsistent answers in response to Deputy Peterson's questions.[4]  Ex. 1, video at 22:37:20-22:40:55, 22:41:27-22:43:04.

At about 10:50 p.m., Deputy Peterson left the defendant in his cruiser with his dog in order to summarize for another deputy, Deputy Olson, the events that had occurred up to that point.[5] Ex. 1, video at 22:49:30-22:51:03; Tr. 13:9-19, 33:16-17, 36:12-14. During that summary, Deputy Peterson discussed the possibility that the defendant had a "suicide load"[6] of narcotics or contraband in the vehicle, and testified that at this time, he "thought there was going to be a suitcase or a bag in the trunk with contraband in it."  Tr. 17:10-21. Deputy Peterson then returned to the cruiser and gave the defendant a written warning for

---

[4]Having viewed the video of the traffic stop, Ex. 1, the court notes that  the passenger's trouble with speaking the English language may have caused some of the apparent inconsistencies.

[5]Deputy Peterson had previously emailed Deputy Olson asking Deputy Olson to come the location. Tr. 13:20-21.

[6]Deputy Peterson testified that a "[s]uicide load refers to when people are driving vehicles," and "there's really no method of concealment of the narcotics or contraband."  Tr. 17:17-19.

4

"driving on the shoulder." Tr. 14:2-3; 32:18-22. After issuing the written warning and giving back the defendant's license and passport, the defendant agreed to Deputy Peterson's request to ask the defendant some additional questions. Ex. 1, video at 22:53:52, 22:54:09-22:54:13; Tr. 14:3-9.

Deputy Peterson first asked the defendant a series of questions relating to whether there was any contraband in the defendant's vehicle.[7] Ex. 1, video at 22:54:29-22:54:54; Tr. 14:10-13. The defendant denied the presence of contraband in the vehicle. Tr. 14:14-16. Next, Deputy Peterson asked the defendant, twice, if the defendant would allow the deputies to search the defendant's vehicle. Ex. 1, video at 22:54:55; Tr. 14:17-20. The defendant told Deputy Peterson both times that the deputies could search the vehicle. Ex. 1, video at 22:54:55. After the defendant agreed to the search, Deputy Peterson advised the defendant that he had the right to refuse consent. Ex. 1, video at 22:54:56. Deputy Peterson then asked the defendant, "You sure . . . nothing to hide?" Ex. 1, video at 22:55:01. The defendant said he did not. Ex. 1, video at 22:55:04. The deputy asked the defendant if he was sure one last time before the deputies searched the vehicle. Ex. 1, video at 22:55:12. The defendant did not change his initial consent or indicate to the deputies that he wanted the deputies to stop searching the vehicle. Tr. 15:3-9. The

---

[7]The questions Deputy Peterson asked the defendant included the following and in the following order: (1) "Everything in the vehicle belong to you guys?"; (2) "Anything stolen?"; (3) "Any guns?"; (4) "Knives?"; (5) "Any bombs?"; (6) "Any large amounts of marijuana?"; (7) "Large amounts of cocaine?"; (8) "Large amounts of heroin?"; (9) "Large amounts of cocaine? "; (10) "Meth?"; (11) "Large amounts of currency, cash?"; (12) "Anything over $10,000?". Ex. 1, video at 22:54:26-22:54:54.

deputies left both the defendant and the passenger in one of the two cruisers, one per cruiser,  with the doors closed, while the deputies searched the vehicle.[8]  Tr. 16:3-6.

The deputies first searched the trunk of the vehicle.  Ex. 1, video at 22:56:44; Tr. 17:6-9.  The deputies did not find any contraband or anything suspicious there.  Tr. 18:4-7.  The deputies then searched the interior of the vehicle.  Tr. 18:8-11.  Deputy Peterson testified that when the deputies lifted the backseat of the vehicle, they saw the vehicle's sending unit[9] and could smell gasoline.  Tr. 19:4-5.  Deputy Peterson testified that he could see suspicious scratches on the sending unit cover that are not usually present when a manufacturer performs maintenance on a vehicle.  Tr. 19:5-6, 17-22.  Deputy Olson then retrieved his tool bag from his cruiser so the deputies could remove the cover of the sending unit themselves.[10]  Ex. 1, video at 23:05:58; Tr. 20:24-25, 21:1.  Deputy Peterson testified that upon removing the sending unit's cover, the deputies could see eleven plastic bundles floating in the gas tank.  Tr. 41:21-25, 42:1-2, 42:22-24.  These bundles contained narcotics, including methamphetamine and cocaine.  Ex. 1, video at 23:20:36; Tr. 42:13-23.  The deputies then placed the defendant under arrest.  Tr. 21:17-22; 22:22-25.

## DISCUSSION

Defendant argues in his motion to suppress that the court should suppress all evidence obtained as a result of the traffic stop.  Filing No. 25.  First, the defendant argues

---

[8]Deputy Peterson removed the passenger from the vehicle and escorted her back to Deputy Olson's cruiser.  Ex. 1, video at 22:56:01.

[9]A sending unit is a separate part of the gas tank that is screwed to the top of the gas tank. Tr. 38:3-4.  Hoses from the gas tank go into the sending unit so that the sending unit can provide gasoline to the vehicle's engine and fuel the vehicle.  Tr. 5:2-4, 38:3-7.

[10]At this time, unknown to the deputies because they were attending to the defendant's vehicle while the defendant was inside Deputy Peterson's cruiser, the defendant said in Spanish, "Please, Virgin, I have sinned.  Please forgive me," Tr. 23:16-18, and "Please, Virgin, I need a miracle.  Help me." Tr. 23:19-20.

that Deputy Peterson stopped the defendant's vehicle without probable cause of unlawful conduct or a traffic violation.  Filing No. 25.  Defendant contends that driving on the shoulder for 100 feet for approximately one second does not constitute a traffic offense under Nebraska law, and, therefore, could not provide probable cause to stop the defendant's vehicle.  Filing No. 26.  Second, the defendant argues that if the initial stop were lawful, the stop became unlawful because the deputies prolonged the traffic stop beyond the time reasonably required to complete the initial traffic stop.  Filing No. 25.  Defendant contends that the stop became unlawful because Deputy Peterson extended contact beyond the time necessary to issue a citation to or identify the defendant.  Filing No. 26.  As a result, the defendant contends that any consent the defendant gave to the deputies to search the vehicle was also unlawful.  Finally, the defendant argues that the search exceeded the scope of any consent the defendant gave.  Filing No. 25.  Defendant contends that the consent he gave followed questions concerning his luggage in the trunk or other items in the passenger compartment of the vehicle, and, therefore, his consent was limited to searching those areas of the vehicle and did not include the sending tank.  Filing No. 26.

After a hearing on defendant's motion to suppress, the magistrate judge recommended that the defendant's motion to suppress be granted.  Filing No. 35.  The magistrate judge was not convinced that "two brief instances of drifting for one second over the shoulder line is a traffic violation."  Filing No. 35 at 4, 7.  Additionally, the magistrate judge found that Deputy Peterson did not have an "objectively reasonable belief that [the defendant] was impaired."  Filing No. 35  at 7.  The magistrate judge reasoned that Deputy Peterson's prior knowledge that the Interstate 680/80 junction often confused drivers made

7

it reasonable for Deputy Peterson to infer a confused driver crossed onto the shoulder, not an impaired driver. Filing No. 35 at 7. Because the magistrate judge found Deputy Peterson stopped the defendant without legal justification, the magistrate judge also found that the evidence gleaned from the stop should be suppressed. Filing No. 35 at 8. As a result, the magistrate judge granted the defendant's motion to suppress.

The government objects to the magistrate judge's F&R. Filing No. 36. First, the government argues Deputy Peterson had probable cause to make the initial stop based on the vehicle crossing the shoulder line. Filing No. 36. Second, the government argues that even if the initial stop was unlawful, the defendant's consent to search the vehicle purged the "taint" from the initial unlawful stop and thereby rendered the evidence admissible. Filing No. 36. Finally, the government argues that even if there was no probable cause to believe the defendant violated a Nebraska traffic law, the circumstances provided Deputy Peterson with a reasonable suspicion that the defendant was impaired, justifying Deputy Peterson stopping the defendant's vehicle.[11]  Filing No. 36.

## *I. Traffic Violation*

The government argues that Deputy Peterson had probable cause to stop the defendant's vehicle because the circumstances presented Deputy Peterson with an objectively reasonable basis to believe the defendant violated Neb. Rev. Stat. § 60-6,142, a Nebraska traffic law that generally prohibits driving on the shoulder of highways. The

---

[11]The first time the government presented the argument that Deputy Peterson had reasonable suspicion of an impaired driver was at the end of the hearing on defendant's motion to suppress. The government presented this argument only after Deputy Peterson changed his response between the prosecution's direct examination, and the defense's cross-examination, regarding why he decided to pull over the defendant's vehicle. *See supra* notes 1-2 and accompanying text. Until that time, the government and Deputy Peterson only asserted that Deputy Peterson pulled over the defendant's vehicle for a traffic violation. *See* Filing No. 28, Pl.'s Br. in Opp'n to Mot. to Suppress; *see also* Tr. 50:2-25, 51:1-2.

court agrees with the magistrate judge, and finds that Deputy Peterson did not have an objectively reasonable basis to believe the defendant "dr[o]ve on the shoulders of highways" by crossing briefly onto the shoulder of the highway.

A traffic stop is lawful if supported by probable cause or reasonable suspicion that a vehicle committed a traffic violation. *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006). Regardless of its severity, a traffic violation provides probable cause to stop a vehicle. *Washington*, 455 F.3d at 826. To determine whether an officer had probable cause or reasonable suspicion to stop a vehicle, the court must determine whether the officer had an objectively reasonable basis to believe a traffic violation occurred. *Id.* at 826 (citing *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005), *cert. denied*, --- U.S. ---,125 S. Ct. 2921, 162 L.Ed.2d 306 (2005); *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996)); *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999). This is so even if the officer based the stop on a mistake of law. *Washington*, 455 F.3d at 826, 827. An officer's mistake of law is objectively reasonable if it is based on a statute's "counterintuitive and confusing language." *See United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005) (finding objectively reasonable basis for stop).

Courts do not expect police officers to interpret traffic laws with the same expertise and subtlety as would a criminal defense attorney. *Sanders*, 196 F.3d at 913. However, "[t]here may be occasions when an officer's understanding of the law is simply unreasonable. In such a case, of course, the officer's belief that there is a traffic violation would not be sufficient to establish probable cause to stop the vehicle." *Id.* at 913 n.3. Additionally, an officer's "subjective good faith belief about the content of the law is irrelevant to our inquiry, 'for officers have an obligation to understand the laws that they are

entrusted with enforcing, at least to a level that is objectively reasonable.'" *Washington, 455 F.3d at 827* (quoting *Martin, 411 F.3d at 1001*).

The traffic law Deputy Peterson pulled the defendant's vehicle over for was Neb. Rev. Stat. § 60-6,142.  That law states:

> No person shall drive on the shoulders of highways, except that:
>
> (1) Vehicles may be driven on the shoulders of highways (a) by federal mail carriers while delivering the United States mail or (b) to safely remove a vehicle from a roadway;
>
> (2) Implements of husbandry may be driven on the shoulders of highways; and
>
> (3) Bicycles and electric personal assistive mobility devices may be operated on paved shoulders of highways included in the state highway system other than Nebraska segments of the National System of Interstate and Defense Highways.

Neb. Rev. Stat. § 60-6,142.  The plain language of the statute prohibits driving on the shoulders of highways for use as thoroughfare or a primary travel area.[12]  *See United States v. Graumann*, No. 8:00-CR-61, Order at *3 (D. Neb. July 20, 2000) (quoting *State v. Latham*, No. CR 98-57, at *3 (Buffalo County, Neb. Sept. 10, 1998) ("It is readily apparent that the type of activity being prohibited by the statute, 60-6,142, is using the shoulders of a highway as a thoroughfare or primary travel area")) (unpublished opinion) (attached as Exhibit A); *cf. United States v. Adler, 590 F.3d 581, 584 (8th Cir. 2009)* ("state courts are the ultimate expositors of state law") (quoting *Mullaney v. Wilbur, 421 U.S. 684,*

---

[12]The government argues that *State v. Davis, 2007 WL 2257886 (Neb. Ct. App. 2007)*, requires this court to find that crossing onto the shoulder for one to two seconds is "driving" on the shoulder.  Filing No. 37 at 6.  The government cites a portion of that opinion which suggests that crossing onto the shoulder may constitute "driving" on the shoulder.  However, the court in *Davis* did "not specifically address the question of whether momentarily crossing onto the shoulder is a violation of Neb. Rev. Stat. § 60-6,142." 2007 WL 2257866, at *2.  Instead, the court only addressed whether a reasonable suspicion that the driver was impaired justified the stop.  *Id*.

691 (1975)).  This statute prohibits driving on the shoulders of highways and then presents three exceptions to that rule that allow for use of the shoulder as a thoroughfare or a primary travel area.  Additionally, Neb. Rev. Stat. § 60-6,142 was not meant to "criminalize and inadvertent momentary crossing onto the shoulder . . . as a pretext to stop otherwise suspicious vehicles."  *Graumann*, No. 8:00-CR-61, at *3 (quoting *Latham*, No. CR 98-57, at *3).

Even though Deputy Peterson is not charged with scrutinizing every detail of the statute, he is charged with understanding this law that he is entrusted to enforce.  Neb. Rev. Stat. § 60-6,142 does not contain language that is counterintuitive and confusing.  Its plain language shows "driving" on the shoulder refers to using the shoulder as a thoroughfare or primary travel area.  Whether Deputy Peterson believed that crossing onto the shoulder constituted "driving" on the shoulder is irrelevant.  Since it is readily apparent that the purpose of Neb. Rev. Stat. § 60-6,142 is to prevent drivers from using the shoulder as a thoroughfare or primary travel area and Deputy Peterson is obligated to understand this law, it is simply unreasonable for him to believe that briefly crossing onto the shoulder violated Neb. Rev. Stat. § 60-6,142.[13]  As a result, Deputy Peterson could not have had an objectively reasonable belief that the defendant violated § 60-6,142.  Therefore, the court finds that Deputy Peterson did not have probable cause to pull the defendant's vehicle over

---

[13]*But see United States v. Gutierrez*, 2008 WL 2415300, at *4, 5 (D. Neb. June 12, 2008) (stating "[t]he other conduct observed by [the officer], specifically driving over the center line and driving onto the shoulder of the road are also violations of Nebraska statute" and finding that the officer "had an objectively reasonable basis for believing the [vehicle] was in violation of Nebraska statutes and had breached any of three different traffic laws"); *United States v. Heir*, 107 F. Supp. 2d 1088, 1094 (D. Neb. 2000) (stating "[d]riving the vehicle onto the shoulder area and following another vehicle by less than two seconds provided the basis for [the officer] to stop the defendant, pursuant to NEB.REV.STAT.ANN  § 60-6, 140 and 142" because "[s]uch moving violations provide probable cause for a traffic stop") (sic).

for violating Neb. Rev. Stat. § 60-6,142 and adopts the F&R of the magistrate judge in this regard.

### II. Impaired Driver

The government argues that even if Deputy Peterson did not have probable cause to believe the defendant violated Neb. Rev. Stat. § 60-6,142, the circumstances presented Deputy Peterson with a reasonable suspicion that an impaired driver was operating the vehicle, sufficient to justify the traffic stop. The court finds that the traffic stop was not justified. Deputy Peterson did not have a reasonable suspicion that an impaired driver was operating the defendant's vehicle.

A police officer may stop a moving vehicle, even if he or she lacks probable cause, "to investigate a reasonable suspicion that its occupants are involved in criminal activity." *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007) (quoting *United States v. Hensley*, 469 U.S. 221, 226 (1985)). "Reasonable suspicion must be based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop'." *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (quoting *Winters*, 491 F.3d at 921). Reasonable suspicion is "less difficult to meet than the probable cause standard." *Long*, 532 F.3d at 795. It requires more than a hunch, but not more than a minimal, articulable, and objective justification for the investigatory stop. *Id*.

The court finds there was no objective evidence suggesting the driver of the defendant's vehicle was an impaired driver. First, a fair distance separated the two instances the vehicle crossed onto the shoulder. Second, each time, the vehicle was only on the shoulder for about one second. Third, of the two times the vehicle touched the

shoulder, one was at the Interstate 680/80 junction, a location Deputy Peterson knew confused drivers.  Finally, the defendant did not engage in any irregular driving other than the two instances already mentioned, including during the mile and a half Deputy Peterson followed the defendant after observing the last incident and before Deputy Peterson finally activated his lights.  Although there is some authority from the Eighth Circuit suggesting crossing onto the shoulder may lead to a reasonable suspicion regarding the driver's ability to operate a vehicle,[14] taken together, the circumstances do not present an objective belief of an impaired driver.

Additionally, the court finds significant the fact that the government only first argued that reasonable suspicion of an impaired driver was justification for the stop at the end of the defendant's motion to suppress hearing.  *See* Filing No. 28, Pl.'s Br. in Opp'n to Mot. to Suppress; Filing No. 34, Tr. 50:18-23.  The government only did so after the defendant's attorney asked Deputy Peterson on cross-examination a leading question suggesting that impairment may have also been a justification for the traffic stop.  Tr. 38:13-18.  Deputy Peterson did not testify as to the alleged impairment until cross-examination.  Even though Deputy Peterson asked the defendant whether he was "ok to drive," the circumstances of this case suggest the possibility of an impaired driver was simply the government's post-

---

[14]*See United States v. Long*, 532 F.3d 791, 794-795 (8th Cir. 2008) (finding reasonable suspicion when vehicle crossed **center line and shoulder**) (emphasis added); *United States v. Mallari*, 334 F.3d 765, 766, 767 (8th Cir. 2003) (finding reasonable suspicion when vehicle **without rear license plate illuminated** drove onto shoulder **three times**) (emphasis added).

hoc rationalization brought about only because the defense brought its possibility to the government's attention.[15]

### III. Consent to Search

Because Deputy Peterson did not have probable cause or reasonable suspicion to stop the defendant's vehicle, the evidence obtained as a result of that illegal traffic stop is considered inadmissible "fruit" of that illegal stop unless means sufficiently distinguishable from the illegal activity allowed him to obtain the evidence and, therefore, purge the primary taint. *United States v. Yousif*, 308 F.3d 820, 829-30 (8th Cir. 2002) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85, 488 (1963)). This result is required by the exclusionary rule, the primary purpose of which is to deter future unlawful police conduct and remove the incentive to disregard an individual's constitutional rights. *Michigan v. Tucker*, 417 U.S. 433, 447 (1974) (quotation omitted). "The controlling question is 'whether granting establishment of the primary illegality, the evidence which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Yousif*, 308 F.3d at 829 (quoting *Wong Sun*, 371 U.S. at 488).

The magistrate judge, discussing the issue of consent for this court's benefit in case this court decided the initial traffic stop was lawful, found that the defendant consented voluntarily to Deputy Peterson searching the vehicle. Filing No. 35 at 10. The magistrate

---

[15]The magistrate judge's F&R suggests the same result. The Honorable Thomas D. Thalken, former United States Deputy Attorney General, found that Deputy Peterson did not have an objectively reasonable belief that the defendant was impaired because the objective circumstances should have presented Deputy Peterson a suspicion of a confused driver, not an impaired one. Filing No. 35 at 7. Even though the magistrate judge did not expressly state it in his F&R, it is easy to infer that he addressed the impaired driver issue so quickly because he found Deputy Peterson was not a credible witness. The magistrate judge is the best judge of credibility, because he is the one who heard and saw Deputy Peterson testify.

judge then discussed this issue with regard to whether the search exceeded the scope of the defendant's consent.  In its objection to the magistrate judge's F&R, the government argues that even if there was no probable cause or reasonable suspicion to stop the defendant's vehicle, the defendant gave consent sufficient to break the nexus between the illegal stop and the resulting seizure of evidence.  This court, however, finds that the defendant's consent to search was not sufficient to purge the taint of the initial illegal traffic stop.

A voluntary and consensual search does not violate an individual's Fourth Amendment rights.  *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005). A court may find that a consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008) (internal quotation omitted).  "Voluntariness is a question of fact to be determined from all the circumstances,' not just by focusing on a single statement made by the officer." *United States v. Moreno*, 280 F.3d 898, 900 (8th Cir. 2002) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 231 (1973)).  Circumstances the court must consider include the details of the interrogation and the characteristics of the accused.  *Griffith*, 533 F.3d at 984.

Relevant details of the interrogation may include:  (1) the length of the detention; (2) whether the police threatened, physically intimidated, or punished the defendant; (3) whether the defendant consented while in custody; (4) whether the defendant relied upon misrepresentations the police made; (5) whether the defendant was in a public or secluded place; and (6) whether the defendant objected or stood by silently while the search occurred.  *Id.* at 984.  Relevant details of the defendant may include:  (1) the defendant's

age and/or education; (2) whether the defendant was intoxicated; and (3) whether the defendant consented after being informed of his or her right to withhold consent. _Griffith,_ _533 F.3d at 984_. A court does not apply these factors mechanically. _Id._ Instead, they serve as a guide to the court's analysis. _Id._

Voluntary consent purges the primary taint of an illegal stop if it was "sufficiently an act of free will." _Moreno_, 280 F.3d at 900 (quoting _United States v. Ramos_, 42 F.3d 1160, 1164 (8th Cir. 1994), _cert. denied_, 541 U.S. (1995)). However, "[V]oluntary consent to search, which was preceded by an illegal police action does not automatically purge the taint of an illegal [seizure]." _United States v. Alvarez-Manzo_, 570 F.3d 1070, 1077 (8th Cir. 2009) (internal quotation omitted) (alterations in original). The Supreme Court provided three factors for courts to consider to determine if consent is sufficiently an act of free will so that it purges the primary taint of an illegal stop: (1) the temporal proximity of the illegality and the consent; (2) the purpose and flagrancy of the official misconduct; and (3) the presence of intervening circumstances. _Moreno_, 280 F.3d at 900 (citing _Brown v._ _Illinois_, 422 US 590, 603-04 (1975); _United States v. Tovar_, 687 F.2d 1210, 1215 (8th Cir. 1982)); _Yousif_, 308 F.3d at 830.

Consent is less likely to purge the taint of misconduct the closer in time it occurs relative to the initial misconduct. _Compare Brown_ 422 U.S. at 604 (taint not purged with two-hour gap), _with Hale v._ Henderson, 485 F.2d 266, 267-69 (6th Cir. 1973) (taint purged with two-day gap), _cert. denied_, 415 U.S. 930 (1974), _and United States v. Owen_, 492 F.2d 1100, 1108 (10th Cir. 1974) (taint purged after four-day gap), _cert. denied_, 419 U.S. 965 (1974). The defendant gave the alleged voluntary consent only 20 minutes after the illegal

stop.  This length of time is not sufficient to purge the primary taint. *See Brown*, 422 U.S. at 604.

Deputy Peterson stopped the defendant's vehicle despite having no legal justification to do so.  As Deputy Peterson testified, he followed the defendant's vehicle because it had out-of-state license plates.  He witnessed the defendant's vehicle cross over onto the shoulder of the highway on two occasions, separated by a fair distance, the later of which occurred at a location where he knew drivers often got confused.  After one and a half miles and the defendant "follow[ing] every traffic law requirement," Tr. 31:19-25, 32: 3-6, Deputy Peterson finally decided to activate his lights and pull over the defendant's vehicle.  No more than 15 minutes into his encounter with the defendant, he believed there were drugs in the vehicle.

An officer advising a defendant of his or her right to refuse consent to search before a search takes place is usually an intervening circumstance that supports the voluntariness of a defendant's consent.  *See Moreno*, 280 F.3d at 901.  However, this is the case only if the officer advises the defendant of his or her right to refuse consent before the defendant consents to the search.  *See Griffith*, 533 F.3d at 984 (advice of right to refuse consent prior to defendant's consent supports voluntariness).  Here, the defendant consented to the search before he was informed of his right to withhold consent.

Looking to all of the circumstances, the court finds that the defendant's consent was not sufficient to purge the taint resulting from the initial illegal traffic stop.  The defendant was secluded in a police cruiser after the police pulled him over for an invalid reason and then began asking him incriminating questions.  This is an inherently coercive situation.  Additionally, the defendant consented to the search only 20 minutes after the police pulled

him over for an invalid reason and before he was advised of his right to refuse consent. Accordingly, the defendant's motion to suppress is granted and evidence obtained from the traffic stop and subsequent search is suppressed.

THEREFORE, IT IS ORDERED:

1.  The government's objection to the magistrate judge's F&R, Filing No. 36, is overruled as set forth herein;

2.  The defendant's motion to suppress, Filing No. 25, is granted as set forth herein; and

3.  The F&R of the magistrate judge, Filing No. 35, is adopted in part and rejected in part.

DATED this 3rd day of August, 2010.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:00CR61 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| DARYL GRAUMANN, | ) | |
| and TROY E. MARTIN, | ) | |
| | ) | |
| Defendants. | ) | |

Before the court is filing no. 34, the "Report and Recommendation" of Magistrate Judge Thomas D. Thalken. In his Report and Recommendation, Magistrate Judge Thalken recommends that this court grant the two motions to supress (filing nos. 17 and 21) filed by the defendants, Daryl Graumann and Troy E. Martin. The government has filed a Statement of Objection (filing no. 35) to Magistrate Judge Thalken's Report and Recommendation (filing no. 34). Accordingly, the court has conducted an independent and de novo review of the record concerning Magistrate Judge Thalken's Report and Recommendation (filing no. 34), including the transcript (filing no. 33) and accompanying exhibits related to the hearing held by Magistrate Judge Thalken on May 3, 2000 on the defendants' motions to suppress (filing nos. 17 and 21). See 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

**BACKGROUND**

On February 4, 2000, Trooper Danny Covert of the Nebraska State Patrol was on duty and traveling east on Interstate 80. (filing no. 33 at 11:5-22) While driving east, Trooper Covert observed that he was overtaking a recreational vehicle also headed East on Interstate 80. (filing no. 33 at 47: 15-19) When the recreational vehicle was approximately 70 yards ahead of Trooper Covert's cruiser, Trooper Covert observed the recreational vehicle momentarily drift approximately one foot onto the south shoulder[1] of Interstate 80. (filing no. 33 at 41: 16-21; 58: 13-17) Believing that the driver of the

---

[1] The Nebraska Rules of the Road define "shoulder" as "that part of the highway contiguous to the roadway and designed for the accommodation of stopped vehicles, for emergency use, and for lateral support of the base and surface courses of the roadway." Neb. Rev. Stat. § 60-661.

1

recreational vehicle had violated Neb. Rev. Stat. § 60-6,142 which prohibits vehicles from driving on the shoulder of a highway, Trooper Covert pulled over the recreational vehicle. (filing no. 33 at 36: 8-11; 37: 21-25; 84:14-22)  During the traffic stop, Trooper Covert discovered a large quantity of marijuana located in the recreational vehicle.

Each of the defendants subsequently moved to suppress all evidence obtained by the government during, and as a result of, the traffic stop.  In their motions to suppress (filing nos. 17 and 21), the defendants contended that Trooper Covert did not have probable cause to pull over their recreational vehicle, because a vehicle's momentarily crossing the line separating the highway from its shoulder is not a violation of the Nebraska Rules of the Road, Neb. Rev. Stat. §§ 60-601 - 6,374 (1999).  After an evidentiary hearing on the defendants' motions to suppress (filing nos. 17 and 21), Magistrate Judge Thalken filed his Report and Recommendation in which he recommended that "Graumann's motion to suppress (Filing no. 17) and Martin's motion to suppress (Filing no. 21) be granted." (filing no. 34 at 5)  In recommending that the court grant the defendants' motions to suppress (filing nos. 17 and 21), Magistrate Judge Thalken stated that "[w]hile driving on the shoulder of a highway is a violation of Nebraska Revised Statute § 60-6,142, briefly crossing over a white line onto the shoulder area, without more, does not constitute a violation of Nebraska law." (filing no. 34 at 3)  Objecting to Magistrate Judge Thalken's Report and Recommendation (filing no. 34), the government asserts that briefly crossing onto the shoulder area of an interstate highway is a violation of Neb. Rev. Stat. § 60-6,142, and, therefore, Trooper Covert had probable cause to stop the defendants' recreational vehicle.

## ANALYSIS

"It is well established ... that any traffic violation, no matter how minor, provides a police officer with probable cause to stop the driver of the vehicle." United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995) (citing cases).  In what appears to be a case of first impression in this Circuit, the sole issue in this case is whether Trooper Covert actually witnessed a violation of Neb. Rev. Stat. § 60-6,142 when he observed the defendants' recreational vehicle momentarily drift partially onto the shoulder of Interstate 80.  Section 60-6,142, entitled "Driving on highway shoulders prohibited; exceptions," provides as follows:

No person shall drive on the shoulders of the highways, except that:

(1) Vehicles may be driven on the shoulders of highways (a) by federal mail carriers

2

while delivering the United States mail or (b) to safely remove a vehicle from a roadway;

(2) Implements of husbandry may be driven on the shoulders of highways; and

(3) Bicycles may be operated on paved shoulders of highways included in the state highway system other than Nebraska segments of the National System of Interstate and Defense Highways.

Neb. Rev. Stat. § 60-6,142.

Whether a vehicle's momentarily being partially on a highway shoulder constitutes "driving" on a highway shoulder in violation of Section 60-6,142 was addressed by Judge John P. Icenogle of the District Court for Buffalo County, Nebraska. In State v. Latham, No. CR 98-57 (Buffalo County, Neb. Sept. 10, 1998), Judge Icenogle held that:

> It is readily apparent that the type of activity being prohibited by the statute, 60-6,142, is using the shoulders of a highway as a thoroughfare or a primary travel area. This is readily ascertainable insomuch as the statute provides exceptions for the use of the shoulder as a primary travel area in certain situations involving mail carriers, removal of vehicles from roadways, driving implements of husbandry down the shoulders of a highway, and the operation of bicycles on paved shoulders.
>
> * * * * *
>
> The purpose of 60-6,142 is not to criminalize an inadvertent momentary crossing onto the shoulder, the use of the shoulder by drivers for emergency situations such as fixing flat tires, or as a pretext to stop otherwise suspicious vehicles.

Id. at 3. The court has examined Judge Icenogle's persuasive opinion concerning whether Section 60-6,142 is violated by a vehicle's moving partially onto the shoulder of a highway. Cf. Hillside v. Enterprises, Inc. v. Continental Carlisle, Inc., 147 F.3d 732, 735 n. 4 (8th Cir. 1998) ("It is not the place of the federal courts ... to reexamine state court determinations of state law questions.").

Although the government cites opinions rendered by the Eighth Circuit Court of Appeals for the government's position that briefly driving onto a highway shoulder violates

3

Section 60-6,142, the court finds the cited cases are distinguishable on their respective facts.  For example,  most of the decisions cited by the government involved drivers who were engaged in conduct that violated other provisions[2] of the Nebraska Rules of the Road.  See, e.g., United States v. Pollington, 98 F.3d 341, 342 (8th Cir. 1996) ("On March 29, 1995, after the **fourth time** Trooper Christopher Thompson saw the tires of a motor home go over the interstate shoulder line, he pulled the vehicle over.") (emphasis added); United States v. Miranda-Garcia, 23 F.3d 1331, 1333 (8th Cir. 1994) ("Trooper Schenck ... observed a U-Haul rental truck in front of him drive its right wheels onto the shoulder of the roadway **three times**, once as far as two and one-half feet off the traveled portion of the interstate.") (emphasis added); United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993) ("Trooper Chitwood observed Barahona's vehicle **change lanes without using a turn signal**, and then drive partially onto the shoulder of the road and back onto the highway.") (emphasis added); United States v. Cortez, 935 F.2d 135, 142 (8th Cir. 1991) ("In the present case, Sergeant Elliott observed the van Cortez was driving go onto the highway's shoulder **twice** and then **cross into the passing lane as another car was trying to pass it**.") (emphasis added).[3]

When confronted with facts similar to those found in the present case, courts have frequently suppressed all evidence obtained from such traffic stops, because there was insufficient justification for an initial stop of the vehicles.  See, e.g., United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000) ("We can not ... agree that one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes" a violation of Tennessee law.); United States v. Gregory, 79 F.3d 973, 978 (10th Cir. 1996) ("We do not find that an isolated incident of a vehicle crossing into the emergency lane of a roadway is a violation of Utah law."); United States v. Ochoa, 4 F.Supp.2d 1007, 1012 (D. Kan. 1998) ("The court finds under the facts of this case that Ochoa's single crossing onto the shoulder was not a violation of Kansas law.");

---

[2] Drifting repeatedly onto a highway shoulder would undoubtedly give an officer probable cause to stop the vehicle for violation of Section 60-6,196 (Driving under influence of alcoholic liquor or drug) or Section 60-6,212 (Careless driving).

[3] In addition, the defendant in at least one of the cases cited by the government did not even contest the validity of the initial traffic stop. See, e.g., United States v. Portmann, 207 F.3d 1032, 1032 (8th Cir. 2000) (defendant stopped for driving onto the shoulder of an interstate highway; however, lack of probable cause for the initial stop of the vehicle not raised by Portmann).

4

<u>United States v. Gastellum</u>, 927 F.Supp. 1386, 1393 (D. Col. 1996) (suppressing evidence obtained from a traffic stop and concluding that "a single instance of weaving over the shoulder" did not violate Colorado law).[4]

In this case, Trooper Covert observed the recreational vehicle for approximately 60-90 seconds before stopping the vehicle. (filing no. 33 at 40:16-18)   While overtaking the defendants' recreational vehicle, Trooper Covert did not observe the recreational vehicle exceed the speed limit (filing no. 33 at 37:19-20), nor did he see the vehicle weaving in its own lane (filing no. 33 at 37:21-25).   The recreational vehicle, which is approximately 35 feet long (filing no. 33 at 12:6-8), and wider than a police cruiser[5] (filing no. 33 at 36:18 - 37:13), drove on the shoulder for approximately 25-30 feet[6] (filing no. 33 at 41:22-24), a distance which is less than one length of the recreational vehicle.   There was a wind blowing toward the south at the time of the traffic stop (filing no. 33 at 38:4-6), and the recreational vehicle is a taller vehicle (filing no. 33 at 36:15-17), making the vehicle more susceptible to gusts of wind.   See <u>Freeman</u>, 209 F.3d at 466 (motor home weaving once onto shoulder on a windy day does not establish probable cause to justify a traffic stop); <u>Gregory</u>, 79 F.3d at 978 (U-Haul truck weaving once onto shoulder does not establish probable cause to justify a traffic stop).   No other vehicles were in the vicinity of the recreational vehicle at the time the vehicle briefly moved onto the shoulder.   (filing no. 33 at 56:14 - 57:1)

While Trooper Covert testified at the evidentiary hearing before Magistrate Judge Thalken on May 3, 2000 that the trooper was concerned that the driver of the recreational

---

[4]   The court is mindful that one of the purposes of enacting the Nebraska Rules of the Road was to "make more uniform highway traffic laws between states."  Neb. Rev. Stat. § 60-602(1).  Indeed, the Nebraska legislature expressed its intention that the Nebraska Rules of the Road "be so interpreted and construed as to effectuate their general purpose to make uniform the laws relating to motor vehicles."  Neb. Rev. Stat. § 60-604.

[5]   Exhibit 102, received during the May 3, 2000 hearing, shows the defendants' recreational vehicle completely occupying the entire width of the interstate shoulder after being stopped.

[6]   Although Trooper Covert testified during the May 3, 2000 hearing that the recreational vehicle traveled on the highway shoulder for a distance of 40-50 feet (filing no. 33 at 13:9-12), the court shall credit Trooper Covert's earlier testimony on February 16, 2000 during a preliminary hearing in Dawson County District Court that the recreational vehicle traveled on the highway shoulder for a distance of only 25-30 feet  (filing no. 33 at 41:22-24).

vehicle might be impaired (filing no. 33 at 39:7 - 40:3), the court finds that merely driving momentarily, and apparently inadvertently or inattentively, onto the shoulder is insufficient to provide an officer with probable cause to believe that the driver is impaired. See United States v. Lyons, 7 F.3d 973, 976 (10th Cir. 1993) ("[I]f failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy."). As the Nebraska Supreme Court observed in Richardson & Gillispie v. State, 263 N.W.2d 442 (Neb. 1978), "it is a matter of common knowledge that careful drivers not only may on occasion, but frequently must, use the shoulders to some extent as a part of the highway...." Id. at 446. In addition, the court notes that Trooper Covert did not express his concern that the driver of the recreational vehicle might be impaired until the hearing before Magistrate Judge Thalken on May 3, 2000 on the defendants' motions to suppress (filing nos. 17 and 21). The court finds it significant that Trooper Covert did not mention his concern about the defendants' impairment during the preliminary hearing on February 16, 2000 in Dawson County District Court, and that he did not note such a concern in his written report of the incident.

Upon review of the language of Section 60-6,142, and the exceptions to the rule stated therein, the court finds and concludes that the Nebraska legislature did not intend to prohibit a driver from momentarily drifting over the shoulder line of an interstate highway on a single occasion. Rather, the Nebraska legislature enacted Section 60-6,142 to prohibit drivers from "driving" on the shoulder, that is, using the shoulder as a thoroughfare or a primary travel area. Construing Section 60-6,142 in this manner effectuates the purpose of the Nebraska Rules of the Road of making "more uniform highway traffic laws between states." Neb. Rev. Stat. § 60-602(1). Accordingly, the court concludes that the defendants did not violate Section 60-6,142 when their recreational vehicle momentarily drifted approximately one foot onto the south shoulder of Interstate 80 on a single occasion.

Therefore, based on a de novo review of the record, the court concludes that the defendants' recreational vehicle was illegally stopped, and, therefore, any evidence derived from the traffic stop will be suppressed. See Wong Sun v. United States, 371 U.S. 471 (1963). Accordingly, after carefully conducting a de novo review of the entire court record, the court finds and concludes that filing no. 34, the Report and Recommendation of Magistrate Judge Thalken is accurate, complete, and in accordance with applicable law. Consequently, the court finds and concludes that filing no. 34, the Report and

Recommendation of Magistrate Judge Thalken, shall be, and hereby is, adopted in it entirety.

THEREFORE, IT IS ORDERED:

(1) That filing no. 35, the "Government's Objection to Magistrate's Report and Recommendation," filed by the plaintiff, the United States of America, is overruled;

(2) That upon de novo review, filing no. 34, the "Report and Recommendation" of Magistrate Judge Thomas D. Thalken, is adopted in its entirety;

(3) That filing no. 21, the "Motion to Suppress," filed by the defendant, Troy E. Martin, is granted; and

(4) That filing no. 17, the "Motion to Suppress," filed by the defendant, Daryl Graumann, is granted.

DATED this 20th day of May, 2010.

BY THE COURT:

_____
THOMAS M. SHANAHAN
United States District Judge

7